RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0276p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

                                                        No. 05-6821

            *v.*

TERRY EUGENE PENNEY,
                    *Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 04-00036—R. Allan Edgar, District Judge.

Argued: October 24, 2008

Decided and Filed: August 7, 2009

Before: BOGGS, Chief Judge; and MERRITT and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Bryan H. Hoss, DAVIS & HOSS, Chattanooga, Tennessee, for Appellant. Steven S. Neff, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** Bryan H. Hoss, C. Leland Davis, DAVIS & HOSS, Chattanooga, Tennessee, for Appellant. Steven S. Neff, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

    BOGGS, C. J., delivered the opinion of the court, in which GRIFFIN, J., joined. MERRITT, J. (p. 27), delivered a separate dissenting opinion.

_____

**OPINION**

_____

    BOGGS, Chief Judge. After a jury trial, Defendant-Appellant Terry Eugene Penney ("Penney") was convicted of fifteen violations of federal drug and gun laws and an attempt to kill a federal agent, and sentenced to 895 months of imprisonment. Penney now appeals the district court's denial of his motions to dismiss some of the charges and to suppress

evidence, the district court's evidentiary rulings, and the reasonableness of his sentence. Penney also argues that the evidence was insufficient to support the jury verdicts or that some counts should have been merged. We hold that the district court committed no reversible errors and, therefore, affirm.

**I**

Terry Eugene Penney lived at 10609 Dayton Pike, in Soddy-Daisy, Tennessee, less than three miles away from the Soddy-Daisy Police Department. Penney raised roosters and ran a bar called Penney's Place, both familial activities that Penney has carried on. For about six years, Penney was in a tempestuous relationship with Devota Bowman, during which Bowman lived with Penney "off and on." Soddy-Daisy police officers were no strangers to Penney's residence, where they were called on the "numerous occasions" when the relationship between Penney and Bowman turned violent. The last of such visits took place on August 2, 2003, when, according to the police report, Penney had "pushed [Bowman] out," and she had left the residence. By August 18, 2003, Bowman had again moved back in with Penney.

On the morning of August 19, 2003, following another quarrel with Penney, a barefoot Bowman hitch-hiked to the Soddy-Daisy police station to file a complaint for assault against Penney. While Bowman was at the station, Penney arrived and demanded that police remove Bowman from his residence. The police arrested Penney for assault and transported him to the Hamilton County Jail. As the police officers worked on Bowman's report, she offered information about narcotics in Penney's house. Detective Mike Sneed requested her consent to search the residence; Bowman agreed and signed a consent form.

Soddy-Daisy officers then accompanied Bowman to the Dayton Pike residence. Bowman led the officers, including Sneed, to the front door, which was locked. Because she did not have a key, Bowman went around to the back door, which she opened without a key. Sneed later learned that only a special "trick" opened the back door. Bowman led the officers around the house, pointing to various items of contraband and picking up her own clothing and personal items as they walked. Officers uncovered numerous guns, cash, scales, and narcotics, removing some of these items from unlabeled, unlocked containers.

Police officers then took their search outside the house, discovering a .22-caliber rifle in a pick-up truck and a shotgun in the chicken house.

The next day, Penney, having been released, went to the Soddy-Daisy police station to inquire about his guns. Sneed explained that the guns were confiscated as a result of a search, to which Bowman consented. Penney informed the police that Bowman did not live with him and had no authority to consent to the search.

Following the search on August 19, 2003, the Soddy-Daisy Police and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") opened an investigation of Penney. During the course of the investigation, police recorded several conversations between Penney and Leonard (a.k.a. Sonny) Stewart, a confidential informant ("CI"). A conversation recorded four months later, on January 3, 2004, revealed that the CI would travel to California to pick up approximately 200 pounds of marijuana, for which Penney would provide two buyers, "Midget" and "Cotton" (a.k.a. William North). On January 12, 2004, in a recorded phone conversation, the CI told Penney that he had returned from his trip and instructed Penney to arrange a meeting with Cotton at Penney's Dayton Pike residence the next day at noon.

Prompted by this conversation, Detective Sneed obtained an anticipatory search warrant for Penney's residence, business, vehicles, and person. The warrant was executable only after Penney met with the CI "to examine and attempt to purchase the narcotics by obtaining funds or promising to obtain funds in the near future in order to complete the transaction." On January 13, 2004, at approximately 12:20 pm, the CI went to Penney's residence, where he found Penney alone without Cotton. In the course of a recorded conversation between the CI and Penney, Cotton telephoned Penney, indicating that he was on his way. The CI left, and made at least three recorded phone calls to Penney to determine whether Cotton had arrived. When Penney finally told the CI to return to the residence, the CI arrived, wired, at approximately 6:15 pm. The CI went inside the residence, met Cotton and Penney, and told Cotton he wanted to see the money. Cotton agreed, stating that he had $35,000 for fifty pounds of marijuana, at $700 per pound; Penney was to receive $100 per pound as the middle-man. Penney remained inside, as the CI and Cotton stepped outside. Cotton showed the CI the money inside Cotton's vehicle. The CI stated that he could see

the money, a predetermined statement to indicate to the police that they should execute the warrant.

Soddy-Daisy police, Hamilton County Sheriff's Department, and ATF officers moved to execute the search warrant. All of the officers were wearing dark bulletproof vests with appropriate official insignia on front and back, identifying them as law enforcement. Some of the officers (the "entry team") knocked on the front door, yelling "Sheriff's Department! Search warrant! Get on the ground!" Other officers, including Sneed, Hamilton County Detective Marty Dunn, and ATF Special Agent Paris Gillette, circled around to the back of the residence, where the vehicle with the money was parked. Sneed testified that as he approached, he saw Cotton and the CI being taken into custody by other officers, and heard activity inside the residence. As Sneed went toward the residence, he heard gunshots. When Sneed approached the back porch, Detective Dunn, who was standing at the back door, told Sneed that Penney had shot him. Penney yelled that he wanted to see a badge, and Dunn threw his badge through the open back door. Sneed also called out to Penney identifying himself, and Penney recognized his voice. Sneed entered the residence with his gun drawn and saw Penney holding a shotgun. Sneed ordered Penney to put down the gun several times, and Penney eventually complied and surrendered the weapon. Detective Dunn and another Hamilton County officer, Mark King, then placed Penney in handcuffs. As a result of the operation, Agent Gillette sustained a serious head wound; Dunn and King were also injured.

The subsequent search turned up $35,000 in Cotton's truck and five weapons inside Penney's residence. No narcotics were found inside Penney's residence.

On February 11, 2004, Penney was indicted for various federal drug and firearm offenses, as well as an attempt to kill a federal agent. A jury convicted Penney of seven counts of drug-related offenses (including possession with intent to distribute, conspiracy and attempt to distribute various large quantities of marijuana and cocaine hydrochloride), two counts of being a felon in possession of firearms, two counts of possession of firearms in furtherance of drug trafficking, one count of possession of a firearm with an obliterated serial number, two counts related to discharging a firearm and an attempt to kill an officer

of the United States.  The district court sentenced Penney to 895 months in prison.  Penney timely appealed.

## II

## A

Penney was charged with two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), on the basis of his 1976 guilty plea in a Tennessee state court.  The district court denied Penney's motion to dismiss the charges and to reconsider, and Penney was convicted of both counts.  Penney rests his appeal to these convictions on two alternative theories.  First, he claims that his 1976 conviction does not qualify as a predicate offense for § 922(g)(1), for three reasons: his guilty plea was not knowing, voluntary, or intelligent; "obvious errors in the paperwork" indicate that Penney was convicted of a misdemeanor rather than a felony; and the 1976 judgment is not entitled to a presumption of regularity because it was never signed by the trial court.  Alternatively, Penney argues that even if he were convicted of a felony, he cannot be convicted of a violation of § 922(g)(1) because he did not lose his right to possess a firearm under Tennessee law in 1976, and that any law that stripped him of that right after the conviction violates the ex post facto clause.

We review *de novo* a district court's denial of a motion to dismiss an indictment on legal grounds.  *United States v. Crayton*, 357 F.3d 560, 564 (6th Cir. 2004).  18 U.S.C. § 922(g)(1) criminalizes the possession of firearms by any person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year."  Federal courts must look to "the law of the state in which a defendant was tried in order to determine whether the defendant was convicted" of such a crime.  *United States v. Cassidy*, 899 F.2d 543, 545 (6th Cir. 1990); 18 U.S.C. § 921(a)(20).  A "crime punishable by imprisonment for a term exceeding one year" does not include convictions of "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less," or convictions that were "expunged, or set aside or for which a person has been pardoned or has had civil rights restored . . . unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not . . .  possess . . .

firearms." 18 U.S.C. § 921(a)(20); *see also United States v. Robinson*, 390 F.3d 853, 879 (6th Cir. 2004).

**1**

Penney argues that his 1976 state conviction cannot form the basis for charging § 922(g)(1) violations because it was unconstitutionally obtained as a result of a guilty plea that was not knowing, intelligent, or voluntary. Because the state court record is silent with regard to his guilty plea, Penney urges that his plea cannot be presumed intelligent or voluntary under *Boykin v. Alabama*, 395 US 238 (1969). The possibility that the 1976 conviction was constitutionally deficient, however, is immaterial. *See Parke v. Raley*, 506 U.S. 20, 29 (1992) (holding that the *Boykin* "presumption of invalidity" was decided on direct review and cannot be "import[ed]" into the "very different context" of a collateral attack, occurring years after the challenged convictions became final). Addressing a statute analogous to § 922(g)(1), the Supreme Court explained that "federal gun laws . . . focus not on reliability, but on the mere *fact of conviction* . . . in order to keep firearms away from potentially dangerous persons." *Lewis v. United States*, 445 U.S. 55, 67 (1980) (emphasis added). Accordingly, we have held that "proof of a defendant's prior felony convictions is admissible for purposes of proving a § 922(g)(1) violation, even if the prior convictions are constitutionally deficient." *United States v. Steverson*, 230 F.3d 221, 224 (6th Cir. 2000).

**2**

Penney contends further that he was convicted of a misdemeanor, not a felony, and that the district court did not adequately account for the numerous errors and inconsistencies in the paperwork in concluding that he was convicted of a felony. Penney was indicted on April 1, 1975 for "feloniously selling a controlled substance." The courtroom minutes for May 19, 1976, indicate that upon Penney's plea, he is found "guilty of Selling A Controlled Substance Schedule IV," and is to serve "a term of 11 months and 29 days at the Hamilton County Penal Farm." The judgment, dated May 19, 1976, states that Penney was charged with feloniously selling a controlled substance, but upon his plea, is adjudged guilty of an "attempt to commit a felony." Penney filed a petition for a suspended sentence, in which he asserted that he pled guilty to "possession of marijuana, a misdemeanor, and was sentenced to the workhouse for a period of Eleven (11) months Twenty-Nine (29) days." Penney's

petition was sustained at a June 28, 1976 hearing, and his sentence was reduced to five years of probation. An additional notation was added to the May 19, 1976 judgment form, stating: "6/28/76 Judgment ordered into execution – petition for suspended sentence sustained . . . ."

Penney points to the inconsistency with regard to the nature of the crime to which he pleaded guilty in the May 19, 1976 courtroom minutes ("selling a controlled substance schedule IV") and in the judgment ("attempt to commit a felony"). That inconsistency, Penney argues, should lead this court to give greater weight to his petition for probation, the only document Penney signed, in determining the nature of his conviction. We find this proposition unconvincing.

The inconsistency does not put in doubt the *fact* of Penney's felony conviction for the purposes of § 922(g)(1) because, first and foremost, "[t]he Court speaks through its judgment," *Chapman v. United States*, 247 F.2d 879, 881 (6th Cir. 1957); *see also United States v. Holloway*, 142 F.3d 437, No. 96-6344, 1998 U.S. App. LEXIS 3939, at *6 n.1 (6th Cir. Mar. 4, 1998) ("[A] court speaks through its judgment, not its minute entries"); *Williams v. Brown*, 921 F.2d 277, No. 90-1034, 1990 U.S. App. LEXIS 21171, at *3 (6th Cir. Dec. 4, 1990) ("Since a court speaks through its orders and judgments, the language in the judgment is controlling."). The judgment states that Penney was convicted of an "attempt to commit a felony," which is a felony under Tennessee law, *Rafferty v. State*, 91 Tenn. 655, 658 (Tenn. 1891), and which was punishable by up to five years' imprisonment under the then-applicable Tennessee law, *Penny v. State*, 2005 WL 3262929, at *4 (Tenn. Crim. App. Dec. 2, 2005) (quoting Tenn. Code Ann. § 39-603 (transferred, § 39-1-501, 1982, repealed 1989)); *see also United States v. Beazley*, 780 F.2d 1023, No. 84-5905, 1985 U.S. App. LEXIS 13896, at *4-5 (6th Cir. 1985) (unpublished table decision) (quoting Tenn. Code Ann. §39-1-501 and citing *Rafferty*, 91 Tenn. 655). The punishment for an attempt to commit a felony – imprisonment in the penitentiary for not more than five years or in the workhouse or jail for not more than one year, Tenn. Code Ann. § 39-603 (1975) (repealed 1982) – is also consistent with Penney's original sentence of 11 months and 29 days in a

county penal farm.**¹** Penney's argument that the judgment is not entitled to a presumption of regularity because the judgment form is not signed by the judge is also misplaced: the form is properly signed by the clerk of the criminal court.

Second, the inconsistency between the judgment and the May 19, 1976 courtroom minutes (identifying "Selling A Controlled Substance Schedule IV" as the crime of conviction) does not erode the determination that Penney was in fact convicted of a felony. Selling a Schedule IV controlled substance was also a felony under then-Tennessee law. Tenn. Code Ann. § 52-1432(a)(1)(D) (1975). Since that felony was punishable by *no less* than two years' imprisonment, *ibid.*, it is unlikely that Penney was convicted of this offense, in view of his original sentence. The most this inconsistency implies is that an attempt to commit a felony was indeed the crime of conviction. In no way does it imply that Penney was actually convicted of possession of marijuana, as stated in his petition for a suspended sentence. The petition is not a court-generated document and has no independent probative value.**²**

Finally, the alleged inaccuracy or clerical error on the judgment form does not vitiate the "fact" of conviction that is necessary and sufficient to support a conviction under § 922(g)(1). *See Lewis*, 445 U.S. at 67. Indeed, Penney has unsuccessfully attempted to amend the 1976 judgment on grounds of clerical error before a Tennessee appellate court, which rejected the claim, thereby confirming the fact of Penney's felony conviction.**³** *Penny,* 2005 WL 3262929, at *4.

---

**¹**That Penney's sentence was ultimately probated is of no consequence: state law at the time permitted judges to suspend and probate sentences for felonies if the maximum sentence imposed is ten years or less. *See State v. King*, 603 S.W.2d 721, 725 (Tenn. 1980) (discussing Tenn. Code Ann. § 40-2901 *et seq.* (1975)).

**²**The petition for probation is of dubious probative value for yet another reason: there is no reference to marijuana as the drug at issue in any court-generated documents, and marijuana could not have been the Schedule IV drug charged in the indictment because it was classified in Schedule VI at the time. *See United States v. Penney*, No. 1:04-cr-036 (memorandum op.) (citing *Smithson v. State*, 509 S.W.2d 526 (Tenn. Crim. App. 1974)).

**³**That court explained:

The petition for probation is the only document that purports to show the petitioner pled guilty to a misdemeanor, while the other two court documents, the judgment and the minutes, both show he pled guilty to a felony. Under these circumstances, we cannot agree with the petitioner's claim that his petition for probation, drafted by his trial counsel, is the most reliable indicator that a

**3**

In the alternative, Penney argues that he cannot be deemed convicted of a crime punishable by at least one year because he never lost his right to own, carry, or possess a gun under Tennessee law. It is undisputed that Penney did not lose his right to possess firearms at the time of his 1976 conviction. However, the district court determined, and the government now argues, that Penney was prohibited from possessing a handgun under Tenn. Code Ann. 37-13-1307(b)(1)(B) as of 1989, and became ineligible to obtain a handgun permit under Tenn. Code. Ann. 39-17-1351 as of 1996. Penney offers a number of arguments as to why the 1989 and 1996 state statutes do not apply to him, and maintains that in any case, these statutes cannot deprive him of the right to possess firearms without violating the ex post facto clause of the Constitution.

We find it unnecessary to decide whether Penney has lost his right to possess firearms under Tennessee laws enacted after he has served his sentence for the 1976 offense. 18 U.S.C. § 921(a)(20) excludes convictions "for which a person has been pardoned or has had civil rights restored," from the category of predicate offenses under § 922(g)(1), "unless such . . . restoration of civil rights expressly provides that the person may not . . . possess . . . firearms." The "unless" clause – and the question of whether a defendant is prohibited from possessing firearms under state law – is only relevant if a defendant's civil rights were *restored. Logan v. United States,* 128 S.Ct. 475, 479 (2007) (holding "that the § 921(a)(20) exemption provision does not cover the case of an offender who retained civil rights at all times, and whose legal status, postconviction, remained in all respects unaltered by any state dispensation").

Penney does not argue that his civil rights were restored. On the contrary, he is emphatic that he never lost his civil rights and therefore had no need to seek restoration of these rights. Appellant's Br. at 30-33. Because the Supreme Court has rejected the

---

clerical error in the judgment may have existed. In addition, regardless of whether we decide the clerical error existed in either of the remaining two court documents, the judgment or the court minutes, the result is the same, the petitioner is a convicted felon.

*Penny v. State,* 2005 WL 3262929, at *4 (Tenn. Crim. App. Dec. 2, 2005).

argument that "[r]ights retained . . . are functionally equivalent to rights revoked but later restored," *Logan,* 128 S.Ct. at 481, even if Penney retained a right to possess firearms under Tennessee law as he argues, he would still not be exempt from conviction under § 922(g)(1).

**B**

Prior to trial, Penney moved to suppress the fruits of the August 19, 2003 search pursuant to Bowman's consent, as well as the fruits of the January 13, 2004 search pursuant to an anticipatory search warrant. The magistrate judge, to whom the motions were referred, recommended denying both motions;[4] the district court adopted the magistrate judge's recommendations over Penney's objections.

"In reviewing a district court's denial of a motion to suppress, this court defers to the district court's findings of fact unless they are clearly erroneous and reviews the district court's legal conclusions *de novo*." *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (citation omitted). We view the evidence "in a light most likely to support the decision of the district court." *Ibid*. (citation omitted). Insofar as the district court relied on the factual findings and legal conclusions of the magistrate judge, the same standard applies to the report and recommendations.

**1**

"The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006) (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990)). A co-occupant's "common authority" depends not on property rights, but "on mutual use of the property by persons generally having joint access or control for most purposes." *Rodriguez*, 497

---

[4]Magistrate Judge Carter recommended the denial of the motions to suppress with the exception of the firearm found in Penney's pick-up truck, over which the magistrate judge determined Bowman had no actual or apparent authority.

U.S. at 181 (citing *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)). Even if a co-occupant in fact lacks common authority over the premises, a search conducted pursuant to his or her consent will not violate Fourth Amendment guarantees if the police reasonably believed that the co-occupant had such authority. *Rodriguez*, 497 U.S. at 186.

Penney argues that Bowman did not have actual or apparent common authority to consent to the search. He argues that Bowman did not have actual common authority over the searched premises because she was at most an overnight guest, who was stripped even of that status prior to the search, and she did not own or have control over the chicken house or the closed containers that were opened during the search. Moreover, Penney claims, police officers could not reasonably believe Bowman had authority to consent because they received "actual notice" that she did not officially reside with Penney and that her co-occupancy of Penney's residence was terminated either on August 2nd or August 19th, and because she did not have a key to the premises.

We need not decide whether Bowman had actual authority to consent to the search because we find that the district court did not err in its determination that she had apparent authority to do so.[5] The magistrate judge and the district judge found that the Soddy-Daisy police officers knew the following facts. Bowman and Penney had been involved in an off-and-on relationship for approximately six years. When the relationship was on, Bowman lived with Penney, which the police officers knew from their numerous visits to the Dayton Pike residence on domestic violence calls. When the relationship was off, Bowman would leave Penney's place. During these periods she resided with her mother, whose address she listed on her August 19, 2003 complaint against Penney. The officers' most recent visit to Penney's residence connected to the couple's turbulent relations occurred on August 2, 2003, as a result of which Penney had kicked Bowman out. Detective Sneed testified that he did not think Bowman was staying at Penney's at the conclusion of the August 2, 2003 incident.

---

[5] The district court did not unambiguously specify on what basis it found Bowman's consent to be valid, stating that she had "actual and/or apparent authority to consent."

On August 19, however, when Bowman arrived at the Soddy-Daisy police station, Bowman told Sneed that although the couple has broken up six months ago, they had now reconciled and that she had moved back in the day before. That morning, in the heat of argument, Penney kicked Bowman out without giving her a chance to collect shoes or her car keys. Bowman then hitched a ride with a passing motorist to the police station.

Once at the residence with Bowman, officers observed further evidence that she was not a mere overnight guest at Penney's house. Bowman's car was parked outside the residence, consistent with her account of that morning's events. She led officers through the residence and picked up her belongings from drawers, a laundry basket, and the washing machine, which she gathered into "several bags." She showed police officers firearms, most of which were in plain view, and identified particular unlocked, unlabelled containers that she knew held narcotics. Bowman told the police that she fed and took care of the chickens when Penney was not there, that she took care of "things around the house," and that she wrote Penney's checks.

The magistrate judge and the district court determined that, given what Soddy-Daisy officers learned on the morning of August 19 and what they knew about Penney's and Bowman's relationship, it was reasonable for them to believe that Bowman was Penney's girlfriend and co-occupant with common authority over the residence. The magistrate judge also noted that it was reasonable for the police not to investigate whether Bowman's name was on the lease "as it is a reality in today's world that consenting adults often co-habitat [sic] together without benefit of legal formalities – including those formalities relating to the establishment of property interests."

The factual findings relied on by the district court and the magistrate judge are well-supported by the record. We agree that the facts known to Detective Sneed and other Soddy-Daisy officers warranted men "of reasonable caution in the belief that the consenting party had authority over the premises," *Rodriguez*, 497 U.S. at 188 (internal quotation marks and citation omitted). We have confirmed a number of times that a live-in girlfriend has common authority over the premises wherein she cohabits with a

boyfriend. *See, e.g., United States v. Grayer*, 232 F. App'x 446, 449 (6th Cir. 2007); *United States v. Hudson,* 405 F.3d 425, 442 (6th Cir. 2005); *United States v. Gillis*, 358 F.3d 386, 391 (6th Cir. 2004); *United States v. Moore*, 917 F.2d 215, 223 (6th Cir. 1990).

As may be inferred from the facts we confronted in *Gillis*, cohabitation need not be uninterrupted to support a reasonable belief in common authority. 358 F.3d 386. In that case, we held that police reasonably believed a girlfriend had authority to consent to a search of a residence where defendant lived, although she told officers that she had left that residence several months earlier as a result of defendant's physical abuse, did not have all the keys necessary to unlock the residence, and was also staying at another address at the time of the search. *Id*. at 388, 391. We explained that the officers' belief was reasonable because the girlfriend stated that "she continued to reside at both" residences, *id*. at 388, "that she had been at the residence earlier that same morning," and "provided them with detailed information about the premises, including the locations where [defendant] had drugs hidden on the property," *id*. at 391. We conclude that in this case, it was likewise reasonable for Soddy-Daisy officers to believe that Bowman was a live-in girlfriend, who enjoyed access to the premises for most purposes, even if the relationship was known to be turbulent and the couple did not cohabit uninterruptedly.

The factors emphasized by Penney on appeal do not undermine the district court's determination that police officers reasonably believed in Bowman's authority to consent. Penney argues that police officers received "actual notice" that Bowman had no actual authority because she listed a different address on her complaint form, and that any authority she had was terminated when Penney arrived at the station and demanded that she be removed from his house. The bare fact that Bowman listed her mother's address on her complaint form is not dispositive: the absence of formalized property rights does not automatically translate into the absence of common authority. *See Matlock*, 415 U.S. at 172 n.7. That the police officers did not perceive this fact as "actual notice" that Bowman has no common authority over Penney's residence is

understandable, especially in view of their knowledge that Bowman occasionally stayed elsewhere (i.e. her mother's residence).

The second fact – Penney's demand that Bowman be removed from his residence – deserves greater consideration.  We recognize that in the abstract, if an occupant with formal authority over the premises takes affirmative and unambiguous action to break relations with a live-in lover and to exclude the latter from the formerly shared dwelling, it may not be reasonable to believe that the latter retains common authority to consent to a search.  However, the reasonableness of police officers' beliefs is evaluated in light of all particular facts known to the officers, not by abstracting from the particulars.  And in this situation, the particular facts Soddy-Daisy officers knew about this particular couple supported their belief that Bowman had common authority over the residence. The officers knew of numerous occasions when the couple has quarreled violently and reconciled, and had no reason to think that the quarrel of August 19 was any different. Lovers' quarrels and reconciliations are as much of a "reality in today's world" as is cohabitation without "legal formalities," and the police cannot be faulted for not presuming that a particular quarrel put an end to the couple's relationship and living arrangements.

Penney further points out that Bowman did not have a key to the residence, which should have indicated that she had no access or control over the residence.  As the magistrate judge and the district court reasoned, this is hardly surprising in view of the circumstances: Bowman did not have a chance to even collect her shoes, let alone pick up a key.

Finally, Penney argues that the rule formulated in *Georgia v. Randolph* "should be extended" to his case.  Appellant's Br. at 48.   In *Randolph*, the Supreme Court held that "[t]he co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a *present and objecting co-tenant*, [and] his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all."  547 U.S. at 114 (emphasis added).  Penney argues that because he was in custody

at the same police station when and where Bowman consented to the search, he was effectively "present," and that because the situation was ambiguous, police were required to ask Penney's permission for the search. Appellant's Br. at 48-49. This is not a viable extension of the *Randolph* rule. As we have explained, the *Randolph* court held that when "a potential defendant with self interest in objecting to the search is present and actually objects, then a third party's permission does not suffice for a reasonable search," but when "that potential objector is 'nearby but not invited to take part in the threshold colloquy,'. . . that potential objector 'loses out,' and the search will be deemed valid." *United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir. 2007) (quoting *Randolph*, 547 U.S. at 121).

We also think that Bowman had apparent authority to consent to the search of closed, but unlocked and unmarked containers inside the residence. Police officers reasonably believed that Bowman had access to the containers wherein narcotics were stored: they could not fail to surmise this from her knowledge of where drugs were located, as well as a note they found in the residence, indicating her assistance in Penney's drug deals. The note, written by Bowman to Penney stated: "Howie came by Fri. evening, I gave him enough out of that I found to make 3 or 4. You can settle up with him." Similarly, Bowman's apparent authority extended to the chicken house, in view of her statement to the police that she helped Penney care for the chickens. In the absence of any indication that Penney expected the containers and the chicken house to be inaccessible to Bowman or sought to make them so, we agree that it was reasonable for the officers to conclude that she had such access for most purposes. Thus, we affirm the district court's denial to suppress the fruits of the August 19, 2003 search executed pursuant to Bowman's consent.

**2**

With regard to the search conducted on January 13, 2004, Penney argues that the evidence should have been suppressed because first, the triggering event identified in the anticipatory warrant never occurred, and second, there was an insufficient nexus

between Penney's residence and the contraband to support probable cause required for an anticipatory warrant.

"An anticipatory search warrant is a search warrant that 'by its terms [takes] effect not upon issuance but at a specified future time.'" *United States v. Miggins*, 302 F.3d 384, 395 (6th Cir. 2002) (quoting *United States v. Jackson*, 55 F.3d 1219, 1223 (6th Cir. 1995)). We have required that "conditions triggering the anticipatory search warrant be 'explicit, clear, and narrowly drawn.'" *Ibid.* (quoting *United States v. Ricciardelli*, 998 F.2d 8, 12 (1st Cir. 1993)). This requirement notwithstanding, an anticipatory search warrant and its supporting affidavit are not to be read "hypertechnically, but in a commonsense fashion." *Ibid.* (internal quotation marks and citation omitted); *see also United States v. Ventresca*, 380 U.S. 102, 109 (1965).

The search warrant obtained by Detective Sneed authorized the search of Penney's residence, locked containers therein, outhouses and vehicles once "Penney meets with the C. I. to examine and attempts to purchase narcotics by obtaining funds or promising to obtain funds in the near future in order to complete the transaction." Penney argues that this event never occurred because he never "examined" the drugs and never obtained or possessed any of the funds himself. Instead, it was Cotton who obtained the money, which remained inside Cotton's vehicle at all times, the CI (Stewart) who was expected to produce the drugs, and neither the money nor the drugs ever touched Penney's hands or crossed the threshold of his residence.

As the magistrate judge and the district court concluded, Penney advances the kind of hypertechnical interpretation of the search warrant's language that our case law disavows. *See e.g., Miggins,* 302 F.3d at 395-96 (holding that a triggering event requiring "the delivery and acceptance of the package by someone inside the residence" was met when "the package was taken by someone who had been inside the residence just prior to its delivery"). As the police knew from their months-long investigation, Penney's role in the upcoming transaction was that of a middle-man, who might not be the one actually handing over the money or the narcotics. Instead, Penney was expected to, as he did, bring together a buyer and a seller in an attempt to complete the deal, in the

course of which the drugs were promised and funds were produced. All the operative transactions specified in the warrant actually occurred: Penney met with the CI, and an attempt was made to purchase drugs with funds that were actually obtained. While the triggering condition could have been formulated in language more attuned to Penney's known and expected role as a middle-man, we find that under a common-sense reading of the warrant, the triggering condition was met when Penney met with Cotton and the CI, and the CI signaled to the police that the funds to be used for the drug purchase were present.

Second, relying on *United States v. Ricciardelli*, Penney argues that the warrant was unsupported by probable cause because the triggering event did not explicitly link the evidence of a crime to Penney's residence. In *Ricciardelli*, the First Circuit held that anticipatory warrants are valid only when "the contraband [is] on a sure and irreversible course to its destination and a future search of the destination must be made expressly contingent upon the contraband's arrival there." 998 F.2d at 12. In this case, Penney claims, the contraband was not on a "sure and irreversible course" to Penney's residence and the triggering event did not condition the search on the contraband's arrival there.

To establish probable cause necessary for every search warrant, the supporting affidavit must set forth "a nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Our task as "a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Carpenter*, 360 F.3d at 594 (quoting *Gates*, 462 U.S. at 238-39). We hold that the issuing magistrate in this case had a substantial basis for so concluding.

As the magistrate judge recognized, anticipatory search warrants are typically sought to conduct searches triggered by a police-controlled delivery of contraband when there is little or no evidence connecting the place to be searched with evidence of a crime

other than the contraband to be delivered. *See Ricciardelli*, 998 F.2d at 10 ("Anticipatory search warrants are peculiar to property in transit."); *United States v. Prince*, 57 F.3d 1071 (unpublished table decision), No. 94-4118, 1995 U.S. App. LEXIS 14815, *5 (6th Cir. June 13, 1995) (same). In these circumstances, rather than "seek permission to search a house for an item they believe *is already located there*," police seek permission to search for an item they believe *will be located there* once specified events occur. *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (emphasis added). The *Ricciardelli* court adopted the "sure and irreversible course" standard to govern a typical anticipatory search warrant: if the contraband to be delivered is the *only* evidence of criminal activity that the police believe will be located in the place to be searched, it is logical to condition the search upon the contraband's arrival at its destination. *See* 998 F.2d at 12.

The present search warrant, however, is not a typical anticipatory warrant contemplated by *Ricciardelli*. The contraband involved in the drug deal arranged by the CI and Penney was not the only evidence connecting Penney's residence to criminal activity. In making his decision with regard to probable cause, the magistrate was entitled to look at the other information regarding prior illicit activity included in the affidavit, *see United States v. Rey*, 923 F.2d 1217, 1220 (6th Cir. 1991),[6] and he was "entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense," *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008) (internal quotation marks and citation omitted). We decline to apply *Ricciardelli*'s "sure and irreversible course" standard to a search warrant supported by a substantially dissimilar – and substantially more informative – affidavit.

---

[6] That a magistrate may rely on information in the affidavit other than the facts regarding the anticipated event in the context of an anticipatory search warrant is undisputed. Federal courts, including ours, have relied on such information to uphold a broader scope for the search than would be justified on the basis of the "triggering" controlled delivery alone. *See, e.g., United States v. Rey*, 923 F.2d 1217, 1220 (6th Cir. 1991) (holding that "indications of prior illicit activity," besides the controlled delivery, justified a search beyond "the seizure of the controlled delivery package"); *United States v. Garcia*, 882 F.2d 699, 704 (2d Cir. 1989) (holding that "additional facts in the supporting affidavit gave rise to probable cause to believe that the apartment was being used as a storage and distribution center for drugs," authorizing a broader search than may have been justified by the delivery of contraband alone).

Detective Sneed's affidavit contained information about prior illicit activity, which contributed to the probability that evidence of drug-trafficking would be found at Penney's residence. Sneed described the August 19, 2003 search and the evidence recovered as a result thereof, noting that the recovered quantity of marijuana was stored in a manner "indicative of large scale marijuana distribution." The affidavit stated that the police received information that Penney received 100 pounds of marijuana from "[H]ispanic individuals" on September 16, 2003, that a Hispanic individual was arrested with 60 pounds of marijuana and admitted having delivered 100 pounds of the drug to Penney. It further related that on January 3, 2004, a discussion between the CI and Penney took place at the latter's residence, arranging for a delivery of over 100 pounds of marijuana. Finally, in describing the anticipated controlled delivery, the affidavit states that "Penny has previously utilized his house and business to transact drug deals, [sic] in the house and business there will be *evidence of this and other drug transactions*." (emphasis added).

It is evident that the issuing magistrate was presented with facts that indicated Penney's more than casual participation in drug trafficking. We have repeatedly held that an issuing judge is "entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the crime and type of offense." *Williams*, 544 F.3d at 686. On this basis, "we have held that an issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." *Id*. at 687 (collecting cases). While past drug-trafficking activity alone does not make such an inference reasonable, "with *continuing* criminal operations, any issue of staleness [of information regarding past criminal activity], or the lack of a direct known link between the criminal activity and residence, becomes minimal." *United States v. Newton*, 389 F.3d 631, 635-36 (6th Cir. 2004) *vacated in part on other grounds*, 546 U.S. 803 (2005) (emphasis added) (citing *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001)). And in this case, the issuing magistrate was presented with an anticipated event that, if and when it occurred, would show that Penney's participation in drug trafficking was "continuing." As the magistrate judge below noted, a "more

immediate temporal context" is precisely what the anticipated drug deal added to the prior illicit activity recounted in the affidavit.

In sum, although the triggering event did not explicitly require that contraband be delivered to Penney's residence, the issuing magistrate had a substantial basis to conclude that the affidavit established a nexus between on-going drug trafficking and Penney's residence, and that there was a fair probability that evidence of drug trafficking would be found when the triggering event took place. *See also Williams*, 544 F.3d at 687 (holding that "even though no criminal activity or contraband [was] observed" at defendant's residence, evidence of "continuing and related illegal firearm activity," allowed the issuing judge to conclude "that evidence pertaining to the handguns would be found in [defendant's] residence").

## C

Next, Penney challenges two of the district court's evidentiary rulings: the exclusion of exculpatory hearsay testimony, and the admission of rebuttal testimony by two government witnesses. We review a district court's evidentiary rulings for abuse of discretion. *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, when it improperly applies the law, or when it employs an erroneous legal standard." *United States v. Cline*, 362 F.3d 343, 348 (6th Cir. 2004) (citations omitted). "We reverse only where the district court's erroneous admission of evidence affects a substantial right of the party." *White*, 492 F.3d at 398 (citing Fed. R. Evid. 103(a)).

## 1

The government filed a motion *in limine* to exclude testimony by Sgt. Van Hinton that, after his arrest, Penney said "you guys don't understand, I thought I was being robbed." Penney argued that this statement was an excited utterance or a present sense impression, and constituted an exception to the hearsay rule under Fed. R. Evid. 803(2) or 803(1), respectively. Fed. R. Evid. 803(2) permits a trial court to admit hearsay statements when they "relat[e] to a startling event or condition made while the

declarant was under the stress of excitement caused by the event or condition." We have held this exception requires the moving party to show, *inter alia*, that the statement was "made before there is time to contrive or misrepresent." *United States v. Arnold*, 486 F.3d 177, 184 (6th Cir. 2007) (en banc) (citing *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983)).

The district court decided not to admit the statement because Penney had time and motive to "contrive or misrepresent." Sgt. Van Hinton testified, and Penney does not dispute, that the statement was made ten to fifteen minutes after the confrontation between Penney and law enforcement was over, and after EMT vehicles arrived at the scene with sirens blaring. At that point, the district court reasoned, Penney "had to have known . . . that . . . he had shot somebody, and most likely that that was a police officer." The district court did not commit reversible error in concluding that because Penney knew what was at stake at the time he made the statement, the statement was unreliable. We also agree with the district court's determination that the statement could not be admitted as a present sense impression for similar reasons, as it was not made "while the declarant was perceiving the event or condition, or immediately thereafter." Fed. R. Evid. 803(1).[7]

## 2

Penney's second challenge is to the admission of rebuttal testimony from two fellow jail inmates, John Shropshire and Larry Dickerson. Both men testified that, while in jail, Penney said that he wished he would have killed the police officers he had shot, so that they could not testify against him. The government sought the introduction of this testimony on rebuttal, after Penney had testified, as a prior inconsistent statement under Fed. R. Evid. 801(d)(1). Penney objected to the admission of this testimony solely on the grounds that it was irrelevant and unduly prejudicial, an argument that he renews

---

[7]Moreover, we note that the exclusion of this statement was unlikely to have affected Penney's substantial rights because the jury was presented with the same information as was contained in the excluded statement: Penney himself presented his argument that he did not know he was shooting at police officers and that he thought he was being robbed, and Agent Melia testified that Penney told him the same thing when Melia interviewed Penney shortly after his arrest.

on appeal.**8** Penney argues that his state of mind months after the fact is not relevant to "any issue in the case." Appellant's Br. at 53. Insofar as the statements have any probative value, Penney argues, it is substantially outweighed by the prejudicial effect the inflammatory statements had on the jury.

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Unfair prejudice "does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence"; rather, it means the damage that results when the introduction of the evidence "tends to suggest [a] decision on an improper basis." *United States v. Caver*, 470 F.3d 220, 240 (6th Cir. 2006) (citations omitted, alteration in original). The government argues that the relevance, or the "legitimate probative force," of disputed testimony is two-fold. First, it was relevant to the question of Penney's intent at the time of the offense. And second, it was relevant to Penney's credibility.

We find dubious the proposition that a statement made months after the fact and after Penney became aware of the charges against him was relevant to establishing Penney's intent at the time of the offense. However, we agree with the district court that the statement was relevant to the question of Penney's credibility. The jury had to evaluate Penney's credibility because his testimony – in particular regarding the January 13, 2004 confrontation – conflicted with that of the law enforcement officers. Penney denied saying that he wished he had killed the officers, which was directly contradicted by Shropshire's and Dickerson's testimony; thus, the possibility that Penney lied under oath was relevant to the jury's evaluation of his credibility. The testimony does not tend to suggest a decision on an improper basis; and to the extent that risk was present,

---

**8**We express no opinion on the question of whether Shropshire's and Dickerson's testimony was properly admitted as a prior inconsistent statement under Fed. R. Evid. 801(d)(1). It appears to us at least questionable whether all the requirements for that exemption from the hearsay rule were satisfied: Penney's statement, to which the two witnesses testified, does not appear to have been "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition," as required by 801(d)(1)(A). Nonetheless, because Penney does not challenge the admissibility of the statement on this basis, and because the statement would likely have been admissible as an admission by a party-opponent under Fed. R. Evid. 801(d)(2), we limit our decision to the question of relevance and prejudice.

Penney had ample opportunity to argue that the statement had no "bearing on his intent at the time of the incident," as the district court observed.

We accord the district court "[b]road discretion . . . in determinations of admissibility based on considerations of relevance and prejudice," and we do not "lightly overrule" those decisions. *United States v. White*, 563 F.3d 184, 191 (6th Cir. 2009) (quoting *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004)). Viewing the decision to admit evidence "in the light most favorable to the government by maximizing the probative value of the evidence and minimiz[ing] its potential prejudice," as we must, we conclude that the district court did not abuse its discretion in allowing the witnesses to testify about Penney's prior inconsistent statements.

**D**

Finally, Penney argues that evidence was insufficient to support his convictions on Counts Six, Twenty, Twenty-One, and Twenty-Two. It appears from the record that Penney did not renew his motion for acquittal after all the evidence was presented. "[W]here, as here, a defendant does not renew his motion for judgment of acquittal for insufficiency of the evidence at the close of all of the proofs, appellate review is limited to determining whether there was a 'manifest miscarriage of justice.'" *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998) (citations omitted). "A miscarriage of justice exists when the record is devoid of evidence pointing to guilt." *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006) (internal quotation marks and citation omitted).

First, Penney argues that there was insufficient evidence to convict him of Count Six, possession of a firearm in furtherance of a drug trafficking crime on August 19, 2003, in violation of 18 U.S.C. § 924(c). As Penney argues, "the possession of a firearm on the same premises as a drug transaction would not, without a showing of a connection between the two, sustain a § 924(c) conviction." *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001). However, if the firearms are "strategically located so that [they are] quickly and easily available for use," their possession can be deemed "in furtherance of" a drug crime. *Ibid.* (citation omitted). The August 19, 2003 search uncovered firearms placed throughout Penney's residence; at least one shotgun was loaded, and several were

next to the $1,300 stash hidden in a bathroom closet. The record is not devoid of evidence to support the conclusion that the firearms were placed strategically and were connected to Penney's drug trafficking.

Second, Penney argues that there was insufficient evidence to convict him of Count Twenty, attempt to kill an officer of the United States, in violation of 18 U.S.C. § 1114. Penney maintains that lighting outside his residence was poor, the blinds on his window were closed, he did not hear or see the law enforcement officers at whom he shot through the closed blinds; all of these factors, Penney argues, make it impossible to establish an intent to kill, amounting to reckless conduct at most. Penney's assertions, however, were contested by the testimony of law enforcement officers, indicating that the officers repeatedly and loudly announced their presence (*e.g.*, Officer King's testimony) and that the entry team's yells could be heard by the officers positioned behind the residence (*e.g.*, Detective Dunn's testimony). The jury was presented with conflicting evidence, and certainly could have rejected Penney's account and believed the testimony of the other witnesses.

Third, Penney challenges his convictions under Counts Twenty-One, discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), and Twenty-Three, possessing a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c). Penney does not elaborate why either conviction lacks sufficient evidence, and we deem these claims waived.

In the alternative, Penney claims that these two counts should have been merged, along with Count Twenty (attempted murder), for the purposes of sentencing. He argues that sentences for Counts Twenty-One and Twenty-Three should be merged because both are "924(c) violations stemming from the exact same incident, the exact same set of facts." Appellant's Br. at 56.

We have previously rejected an identical argument on substantially similar facts. *United States v. Nabors*, 901 F.2d 1351 (6th Cir. 1990). In particular, we held that when "two separate predicate offenses for triggering § 924(c)(1) were charged and proven," a defendant may be convicted and sentenced for two separate crimes, even if both

offenses were committed in the course of the same event. *Id*. at 1357-58. Here, as in *Nabors*, the two violations of § 924(c)(1) of which Penney is convicted are based on distinct predicate offenses: attempted murder of a federal agent, and an attempt to possess marijuana with the intent to distribute. Penney's unelaborated claim that Count Twenty should have been merged with Twenty-One and/or Twenty-Three for the purposes of sentencing is precluded by the text of the statute. 18 U.S.C. § 924(c)(1)(D)(ii) ("[N]o term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed."). Therefore, the district court did not commit an error by imposing consecutive sentences for these three crimes.

Lastly, Penney argues that there was insufficient evidence to convict him of Count Twenty-Two. Penney's argument relies on a misstatement of the crime of conviction. He claims that he could not be convicted for "possessing marijuana with the intent to distribute on January 13, 2004," because there was no marijuana in Penney's home on that date. Penney was convicted, however, of aiding and abetting an attempted possession of marijuana, along with Cotton (North). To justify a conviction on this count, the government had to prove "(1) an act by a defendant that contributes to the execution of a crime; and (2) the intent to aid in the crime's commission." *United States v. Gardner*, 488 F.3d 700, 711 (6th Cir. 2007). There was ample evidence presented at trial that Penney arranged the drug deal between North and the CI.

We conclude that the convictions on all of the disputed counts entailed no manifest miscarriage of justice and do not warrant reversal.

## III

Penney's last challenge is to the reasonableness of his sentence. In particular, Penney argues that the 660 months of his 895-month sentence that were based on the three § 924(c) convictions are unreasonable because (1) two of these convictions are based on occurrences of the same day and involved the same gun, (2) the district court

did not consider 18 U.S.C. § 3553(a) factors, and (3) this is effectively a life sentence given his age.

The 660 months that Penney emphasizes as unreasonable were imposed pursuant to mandatory minimum sentences and a statutory requirement that the sentences run consecutively to any other terms of imprisonment. 18 U.S.C. § 924(c)(1)(D)(ii). "§ 3553(a) factors do not apply to congressionally mandated sentences." *United States v. Franklin*, 499 F.3d 578, 585 (6th Cir. 2007). The balance of the sentence – 235 months – was imposed for the remaining counts. The sentences for each count ranged from 60 to 235 months and were to run concurrently. The district court properly considered the § 3553(a) factors, insofar as it had discretion in the imposition of the non-statutorily mandated portion of the sentence. In particular, the district court stated that after careful consideration, it found that the need for deterrence and the protection of the public were the most important factors to consider in sentencing Penney. *See United States v. Mayberry*, 540 F.3d 506, 518 (6th Cir. 2008) ("A judge is not required, however, to expressly state each of these factors at sentencing, so long as his or her opinion reflects a consideration of these factors.") The sentence imposed was within the Guidelines range, and is thus presumptively reasonable on review. *See United States v. Heriot*, 496 F.3d 601, 608 (6th Cir. 2007); *Gall*, 128 S. Ct. at 597. Penney does not provide us with any reason to doubt the presumption, and we conclude that the district court's sentence was reasonable.

**IV**

For the reasons stated above, we AFFIRM the district court on all issues presented.

---

**DISSENT**

---

MERRITT, Circuit Judge, dissenting. I disagree with the Court's holding that the local Soddy-Daisy police had the authority under the Fourth Amendment to search Penney's home without a warrant on August 19, 2003, because Bowman, as Penney's intermittent, live-in girlfriend, had the "apparent authority" to consent to the warrantless search. Therefore, I disagree with Section II.B.1 of the Court's opinion. "Apparent authority" is absent because the local police had observed and knew that the girlfriend had just come to the police station that morning where she had stated that Penney had made her leave his house — had actually "thrown her out." They knew that she had no key and that they would, and did, have to break into the house. The record is clear that they also had observed and knew that Penney had followed the girlfriend to the police station and had told the police he had removed her from his home and did not want her staying there any longer. He made a request of the police that she be kept off of his property. All of these facts are clear in the record. The Court does not deny that these are the facts of the case. It does not point to any factual dispute to be resolved concerning these facts.

Based on these undisputed facts, it is beyond me to understand how the girlfriend could have any kind of authority, actual or apparent, from Penney to consent to a search of his home. In my view, the Court has not performed its judicial duties in an impartial manner on this issue and has simply followed its inclination to favor the authority of the police over the liberty of the individual citizen granted by the Fourth Amendment. "The right of the people to be secure in their . . . homes . . . against unreasonable searches and seizures" has been openly abridged. The decision here is simply a backhanded way of repealing the exclusionary rule and extinguishing the protections of the Fourth Amendment because the law, as written by the Founders, is inconvenient and hinders criminal convictions. What should be an open and shut Fourth Amendment violation is spun as a close case and decided in favor of the police.