*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0047P (6th Cir.)
File Name: 04a0047p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

No. 02-5957

GREGORY DARNELL GILLIS,
*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 01-00164—R. Leon Jordan, District Judge.

Argued: October 22, 2003

Decided and Filed: February 12, 2004

Before: BOGGS, Chief Judge; GIBBONS, Circuit Judge;
GWIN, District Judge.*

---

### COUNSEL

**ARGUED:** Paula R. Voss, FEDERAL DEFENDER
SERVICES, Knoxville, Tennessee, for Appellant. J. Edgar

---

* The Honorable James S. Gwin, United States District Judge for the
Northern District of Ohio, sitting by designation.

Schmutzer, ASSISTANT UNITED STATES ATTORNEY,
Knoxville, Tennessee, for Appellee. **ON BRIEF:** Paula R.
Voss, FEDERAL DEFENDER SERVICES, Knoxville,
Tennessee, for Appellant. J. Edgar Schmutzer, ASSISTANT
UNITED STATES ATTORNEY, Knoxville, Tennessee, for
Appellee.

---

### OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. Defendant-
appellant Gregory Darnell Gillis appeals the district court's
decision denying his motion to suppress evidence obtained as
the result of a warrantless search of a residence on
November 7, 2001. Police obtained consent to search from
Gillis's girlfriend, Shaneska Williams, after she informed
them that she had seen Gillis and several others smoking
marijuana and cooking crack cocaine inside the house earlier
that morning. Police knew that Williams had maintained a
separate residence since June 2001, but she showed the
officers a copy of a lease for the house that had her name on
it, and she gave them detailed information about where drugs
were hidden on the premises. The search revealed a small
amount of marijuana inside the residence, small amounts of
crack cocaine and marijuana inside Gillis's car, and 60 grams
of crack cocaine in a wrecked Nissan Maxima parked in the
driveway. The district court denied Gillis's motion to
suppress, and Gillis later pled guilty to one count of
knowingly and intentionally possessing with intent to
distribute fifty grams or more of a mixture and substance that
contains cocaine base, in violation of 21 U.S.C. § 841(a)(1)
and (b). For the following reasons, we affirm the judgment of
the district court.

### I.

On November 7, 2001, Officers Kelly Tanner and Anthony Barnes of the Knoxville Police Department responded to a domestic disturbance call at 2108 Texas Avenue ("2108"). Upon arrival, they spoke with Shaneska Williams, who told them that she had gone to a house at 1500 Texas Avenue ("1500") earlier that morning. Williams told the officers she had observed her boyfriend, Gregory Gillis, and several others smoking marijuana inside the residence. According to Williams, she had an argument with Gillis, and he pushed her out of the house and locked the door. Williams claimed she had another argument with Gillis back at 2108 later that same morning. During this argument, Gillis purportedly took $60 from Williams's coffee table and slapped her across the face.

When the officers arrived, Williams asked them to remove Gillis from 1500, and she showed them a copy of the lease for the residence that had her name on it. The officers refused this request because Gillis's name was on the lease as well, although it turned out that he had been listed only as a witness. At this point, Williams became angry, and she began to tell the police about additional drug activity she had observed recently at 1500. In particular, Williams told the officers that she had seen Gillis cooking two pots of crack cocaine that morning and that he was using the residence to sell large quantities of marijuana, crack, and ecstasy.

The police responded by inquiring further into Williams's use and knowledge of the premises. She told the officers she had left 1500 in June 2001 because Gillis had been physically abusing her and because she felt the residence was unfit for their baby. However, she also told the officers that she continued to reside at both 1500 and 2108, and she gave the officers detailed information about where Gillis had drugs hidden on the property. According to Williams, Gillis kept drugs hidden inside the kitchen cabinets, in a vanity area in the bathroom, and inside two cars: a Caprice Classic, and a wrecked Nissan Maxima that was parked in the driveway.

Williams also had keys to a set of interior wooden doors at 1500. Gillis had the locks changed on the exterior metal doors, but Williams told the officers that these doors were broken during a recent break-in and that she was able to gain access to the residence through them if Gillis did not answer the door. Williams gave the officers her consent to search the premises at 1500.

Tanner and Barnes contacted Officer Gina Pierce with the Organized Crime Unit, who subsequently briefed the officers charged with conducting the search. These officers were told of the locations on the property where Williams said Gillis had been hiding drugs, and they were also told that there was an outstanding warrant for a Gregory Gillis. This warrant was actually for Gillis's father, but at that time the police were not aware that two Gregory Gillises lived in the community.

When the investigating team arrived at 1500, they observed two people seated in a Caprice Classic parked in the driveway. The car's engine was still running. As Officer Todd Gilreath approached the vehicle, he noticed the driver bending down and reaching underneath the steering column. Gilreath opened the driver's side door and he immediately detected the odor of marijuana. He recognized Gillis as the man sitting in the driver's seat and asked him to step out of the vehicle. As he patted Gillis down, Gilreath noticed a bulge in Gillis's front pocket that turned out to be $1000. Gilreath arrested Gillis because he thought there was an outstanding warrant for his arrest at the time and because he felt that Gillis had "obviously" been smoking marijuana.

After reading Gillis his rights, Gilreath asked for his consent to search the Caprice. Gillis refused. Gilreath opened the door to the vehicle anyway and shined his flashlight on the floorboard in the area where he had noticed Gillis reaching immediately before his arrest. He noticed a plastic bag sticking out from underneath the steering column and removed it. This bag contained 11.4 grams of crack

cocaine. Gilreath also discovered a small amount of marijuana in the floorboard directly under the driver's seat.

While Gilreath was conducting his search of the Caprice, a group of additional officers also on the scene announced their presence and entered the residence through the set of broken metal doors Williams had told them about. Inside they discovered a small amount of marijuana in a kitchen cabinet and some postal scales. Outside the residence, Officer Walter Ricketts with the K-9 unit informed Drug Enforcement Administration Agent Stephen Ribolla that his dog had "alerted" on the wrecked Nissan Maxima that was parked in the driveway directly in front of the Caprice. At the suppression hearing, several officers testified that the Maxima was not capable of being driven. Ribolla testified that the Maxima did not have an engine and that it may not have had wheels. The windshield and several side windows were also missing. The car was unlocked, and spare parts were piled inside of it. Ribolla described the Maxima as a "shell of a vehicle" and counsel for Gillis characterized it as a "storage shed." After Ricketts informed him of the canine alert, Ribolla searched inside the Maxima and discovered two grocery bags located underneath door panels that were lying on the floor of the vehicle. The bags contained sixty grams of crack cocaine and a digital scale.

While the search was still being conducted at 1500, Pierce went to 2108 to speak with Williams and to obtain a written statement memorializing her prior oral consent. In her statement to police, Williams indicated that she also "live[d] at 1500 Texas" and that she had given the police "verbal consent to search the house for drugs."

After the search, Gillis was taken to the police station. He waived his *Miranda* rights and admitted to possessing the marijuana and crack cocaine that were found inside the Caprice, but he denied any knowledge of the drugs found inside the house or in the Maxima. Gillis was charged in a one-count indictment with knowingly and intentionally

possessing with intent to distribute fifty grams or more of a mixture and substance that contains cocaine base in violation of 21 U.S.C. § 841(a) and (b).

Gillis filed a motion to suppress all of the evidence obtained from the search of the premises at 1500 on the grounds that the officers did not have probable cause to conduct the search. In the investigation following Gillis's arrest, Williams denied that she ever gave consent to search the premises at 1500 and said that she thought she was consenting to a search of the premises at 2108 instead. At the suppression hearing, Williams testified that Pierce threw away her first written statement and told her that she had not written it "appropriately." According to Williams, her original statement had described 1500 as her "baby's father's house," but Pierce told her to rewrite it and to emphasize that 1500 was her house and not Gillis's. Williams also testified that after she left the house in June, she took most of her personal belongings with her to 2108, and that Gillis thereafter paid the rent at 1500.

The district court overruled Gillis's motion to suppress. The court concluded that Williams had actual authority to consent to the search of the premises at 1500 and that the officers could reasonably conclude that the scope of her consent extended to the Maxima because she told them that Gillis kept drugs inside it. The court also found that even if Williams did not have actual authority to consent to the search, the officers reasonably believed that she had apparent authority to consent because they had a copy of a lease that had her name on it, they knew she sometimes stayed at 1500 with Gillis, and they knew that she had a set of keys to the interior wooden doors. The court also rejected Gillis's argument that Gilreath did not have reasonable suspicion to seize him while he was seated in the Caprice and concluded that Gilreath's subsequent search of that vehicle was a proper search incident to arrest under *New York v. Belton*, 453 U.S. 454 (1981). On appeal, Gillis argues that the district court erred in denying his motion to suppress because Williams did

not have actual or apparent authority to consent to a search of the premises at 1500.

## II.

In reviewing a district court's denial of a motion to suppress evidence, this court reviews the district court's findings of fact for clear error, and its legal conclusions *de novo*. *United States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999).

The Fourth Amendment normally prohibits the warrantless search of an individual's home. *United States v. Haddix*, 239 F.3d 766, 767 (6th Cir. 2001). However, the prohibition does not apply to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Common authority is not to be implied from a mere property interest that a third party has in the property, but from "mutual use . . . by persons generally having joint access or control for most purposes." *United States v. Matlock*, 415 U.S. 164, 172 n.7 (1974). The burden of establishing that a third party possesses common authority to consent to a search rests with the state. *Rodriguez*, 497 U.S. at 181. Even if a third party does not possess actual common authority over the area that was searched, the Fourth Amendment is not violated if the police relied in good faith on a third party's apparent authority to consent to the search. *Id.* at 188-89. Apparent authority is judged by an objective standard. *Id.* A search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had authority to consent to the search. *Id.*

The district court concluded that Williams had actual authority to consent because her name was on the lease. The court also found that even if Williams did not have actual authority, the officers could reasonably conclude that she had

apparent authority to consent to the search. Because we agree with the district court's decision that Williams had apparent authority, we need not consider whether she also possessed actual authority. Gillis argues that it was not reasonable for the officers to believe that "a single mother living in public housing was maintaining a second residence on the side, even though she had no keys, no way to let them in without Mr. Gillis's permission and no personal property remaining there." However, the police did not know that Gillis was paying the rent for 1500 at the time of the search or that Williams had no personal property remaining there, particularly since they had not even been inside the residence at 1500 yet. The officers did know that Williams had provided them with detailed information about the premises, including the locations where Gillis had drugs hidden on the property. They also had statements from Williams that she continued to reside at 1500 and that she had been at the residence earlier that same morning. Under these circumstances, the officers had enough information at the time of the search to reasonably conclude that Williams had apparent authority to consent.[1]

While the officers could reasonably conclude that Williams had authority to consent to a search of the premises, that does not mean that the scope of her consent necessarily extended to the Maxima. *See United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978) ("[A]uthority to consent to [a] search of a general area . . . cannot be thought automatically to extend to the interiors of every discrete enclosed space capable of search within the area."). Guests and co-residents in a house may have privacy interests in specific property which cannot

---

[1] Gillis does not specifically challenge the search of the Caprice in his brief, but did so at oral argument in response to a question from the panel. To the extent he argues that the search of the Caprice was unlawful because the officers did not have actual or apparent authority to be on the premises, we reject this argument. The police relied in good faith on Williams's apparent authority to consent and were lawfully present at the time of the search.

be waived by a third party's consent to a general search of the premises. *See id*. at 541-42.

Before we consider the scope of Williams's consent, however, we must determine whether Gillis had a legitimate expectation of privacy in the contents of the Maxima. If Gillis had no such expectation of privacy, then he lacks standing to challenge the constitutionality of the search, and the scope of Williams's consent is irrelevant. *See Rakas v. Illinois*, 439 U.S. 128 (1978). In determining whether an individual has a legitimate expectation of privacy in a particular area searched, this court considers (1) whether the defendant exhibited an actual subjective expectation of privacy, and (2) whether the defendant's subjective expectation of privacy is "one that society is prepared to recognize as reasonable." *United States v. Knox*, 839 F.2d 285, 293 (6th Cir. 1988) (quoting *United States v. Tolbert*, 692 F.2d 1041, 1044 (6th Cir. 1982)).

In this case, several officers testified to the dilapidated conditions of the Maxima. The car was unlocked, and the windshield and several side windows were missing. At least one person other than Gillis knew that he was hiding drugs inside of it. If, as Gillis contends, the Maxima was more like a "storage shed" than like an actual automobile, Gillis took no reasonable precautions to ensure that the contents of his storage area remained private. Ribolla testified that anyone walking down the street could have walked over to the Maxima and reached inside of it for any purpose. Given the conditions of the Maxima, we conclude that Gillis did not have an expectation of privacy in its contents that society would be prepared to recognize as reasonable. *See United States v. Grecni*, 1991 WL 139703, at * 3 (6th Cir. July 30, 1991) (defendant had no reasonable expectation of privacy in the contents of his vehicle when, in trying to elude police, he left his car unlocked and unoccupied with the keys in the ignition). He therefore cannot contest the admissibility of the evidence obtained from the search of that vehicle.

## III.

For the foregoing reasons, we affirm the judgment of the district court.