**NOT RECOMMENDED FOR FULL TEXT PUBLICATION**
File Name: 15a0726n.06

Case No. 14-5946

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Oct 30, 2015

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **ON APPEAL** FROM THE UNITED |
| Plaintiff-Appellee, | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| v. | ) | KENTUCKY |
| | ) | |
| DONALD DEMIL CLAY, | ) | **O P I N I O N** |
| | ) | |
| Defendant-Appellant. | ) | |

**Before: CLAY and SUTTON, Circuit Judges; and WATSON, District Judge.**[*]

**MICHAEL H. WATSON, District Judge**. Defendant-Appellant Donald Demil Clay

("Clay") was convicted of one count of Possession with Intent to Distribute Cocaine, a Schedule

II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1); one count of Possession of a

Firearm in Furtherance of Drug Trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and one

count of Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). Clay appeals

his convictions, arguing that: (1) the district court erred by denying his motion to suppress, and

(2) a rational jury could not have convicted him of possessing a firearm in furtherance of a drug-

trafficking crime. For the following reasons, we **AFFIRM**.

### I. Facts

Clay and his live-in girlfriend, Kendra Mitchell ("Mitchell"), resided at an apartment in

Frankfort, Kentucky ("the apartment"), starting around Valentine's Day of 2013. While Mitchell

stored clothes and other personal belongings at the apartment, she did not spend every night

---

[*] The Honorable Michael H. Watson, United States District Judge for the Southern District of
Ohio, sitting by designation.

there. When Mitchell did not stay at the apartment, she would stay at her grandmother's residence. The apartment had a living room, a kitchen, one bedroom (where Mitchell would sometimes stay with Clay), and two closets, one of which was locked whenever Clay was not present. Mitchell testified that aside from the locked closet, she had access to the entire apartment. She also used Clay's van.

Neither Clay nor Mitchell was the lessee of the apartment. Clay owed past rent payments to the apartment's management company, Peach Rentals, so Clay's friend, Shawn Gross ("Gross"), agreed to lease the apartment in his own name and pay rent to Peach Rentals with cash provided by Clay. Clay never gave Mitchell a key to the apartment despite promising to do so; however, Mitchell claimed to have never been locked out.

Mitchell and Clay apparently fought often and early on April 23, 2013, Mitchell and Clay began to argue. Clay told Mitchell to leave the apartment. Mitchell began walking toward the exit when Clay knocked her down several times and scratched her face. Neighbors heard Mitchell's screams for help and saw Mitchell and Clay struggling at the apartment's doorway. The neighbors told Clay to get off of Mitchell and threatened to call the police. Clay fled. Mitchell went to her grandmother's residence and called the Frankfort, Kentucky, police. This all occurred before 7:00 a.m.

Sergeant Chris Quire ("Sergeant Quire") responded to Mitchell's call and asked her to come down to the station. At the station, Mitchell told Sergeant Quire that Clay had assaulted her and that she was tired of his violence and wanted to speak to the police about drugs and a gun he stored at the apartment. Mitchell informed Sergeant Quire that Clay's violence generally correlated with his drinking and substance abuse. She also told Sergeant Quire that she lived at

the apartment with Clay, that she stored clothes and other personal belongings there, and that she shared a van with Clay, which she described to Sergeant Quire. She also told him that Clay stored a gun and drugs in the apartment's closet. It was disputed whether Mitchell told Sergeant Quire that the closet was locked during this interview, or whether the police discovered that fact when they searched the apartment. Mitchell also told Sergeant Quire that, during her struggle with Clay, Clay had told her to leave and that she lost a cell phone somewhere near the apartment.

Sergeant Quire's supervisor, Lieutenant Stephen Sutton ("Lieutenant Sutton"), also spoke with Mitchell that morning. Mitchell told Lieutenant Sutton about the assault, that she had lived at the apartment for the last several months, and that Clay stored drugs and a gun at the apartment. Mitchell told Lieutenant Sutton that she wanted to press charges against Clay for the assault and to help the police obtain Clay's drugs and gun. Lieutenant Sutton testified that Mitchell also told him she wanted to retrieve some clothing from the apartment. Both officers noted that Mitchell was clearly shaken, and her face was bruised.

Mitchell prepared a written statement in which she wrote that she had "lived [at the apartment] with [Clay] since February 2013." R. 25 at 55. Mitchell signed a form consenting to the search of the apartment. On that form, however, she listed her contact address as her grandmother's residence.

Mitchell did not inform Sergeant Quire or Lieutenant Sutton that Gross was the true leaseholder of the apartment or that she did not have a key to the apartment. Mitchell later testified that she did not consider herself to have the right to reenter the apartment at that time but that she did not express her belief to the officers.

3

At approximately 8:00 a.m., Lieutenant Sutton dispatched the first unit of officers to the apartment to search for Clay. Lieutenant Sutton followed. Sergeant Quire and Mitchell left the station closer to 8:30 a.m. After all of the officers arrived at the apartment, Lieutenant Sutton and other officers entered the building while Sergeant Quire remained outside with Mitchell. Sergeant Quire reported that Mitchell was very upset, crying, and emotional, and that Mitchell stated, "'I can't believe I'm doing this. I never thought I would be on this side.'" *Id.* at 66. Sergeant Quire reported seeing the van described by Mitchell in the parking lot. Both Lieutenant Sutton and Sergeant Quire reported seeing a broken cell phone between the front door of the apartment and the parking lot.

After Lieutenant Sutton and the other officers attempted to knock and announce their presence, the police opened the door using a key provided by John Goode ("Goode"), a building maintenance person. While one officer guarded the entrance, the remaining officers, including Lieutenant Sutton, conducted a cursory search of the apartment. The police observed drug paraphernalia on the bedroom dresser and a white powdery residue (suspected and later confirmed to be cocaine) on top of the entertainment console. The police encountered the locked closet and asked Goode and Mitchell about the lock. Goode said that it was not a standard feature of the apartment and Mitchell said that Clay had installed it a few days earlier.

Around 9:00 a.m., Lieutenant Sutton ordered an officer to guard the apartment entrance and Sergeant Quire to go back to the police station to draft a search warrant for the apartment and the locked closet. Sergeant Quire, along with Detective Robert Courtney ("Detective Courtney") and Sergeant Mike Frazee ("Sergeant Frazee"), drafted a warrant application to search the apartment. After a Special Circuit Court Judge signed the warrant, Lieutenant Sutton,

4

Detective Courtney, and Sergeant Frazee searched the entire apartment, took photographs, and logged evidence. Goode assisted in removing the closet door cleanly to allow the police access.

The police recovered the following, all of which was entered into evidence at trial: On the locked closet's top shelf was a purple Crown Royal bag with approximately 82.59 grams of cocaine, split into three equal parts of around twenty-seven grams each, as well as a black leather bag with a loaded Jennings Model, Bryco .380 semi-automatic handgun, which sat in front of a cordless hand drill. In a dresser in the bedroom, the police found evidence in two drawers. In the first drawer, the police seized drug paraphernalia as well as a shoe box with baggies and rubber bands, two sets of digital scales, and two cell phones. The second drawer contained paperwork, cash, and two more cell phones. Underneath a couch cushion, the police located an additional 16.93 grams of cocaine. The police collected a total of 100.87 grams of cocaine and over $500 cash.

## II.     Procedural History

Clay moved to suppress the evidence obtained as a result of the searches. The district court judge referred the motion to a magistrate judge for a report and recommendation ("R&R"). The magistrate judge held an evidentiary hearing at which Mitchell, Sergeant Quire, Lieutenant Sutton, Detective Courtney, Goode, Gross, and a representative from Peach Rentals testified, and then issued an R&R concluding that Mitchell did not have actual authority to consent to a search of the apartment but did have apparent authority to consent to the initial search. Therefore, he found, the information obtained from the initial search was validly used and provided probable cause to support the warrant application. Accordingly, the Magistrate Judge found the evidence

obtained from the second search was also valid. After a *de novo* review, the district court judge adopted the R&R, overruling Clay's objections.

Thereafter, the district court held a three-day jury trial, after which the jury found Clay guilty of all counts. The district court sentenced Clay to seventy (70) months' imprisonment for possession with the intent to distribute and seventy (70) months' imprisonment for possession of a firearm as a felon, to run concurrently, and sixty (60) months' imprisonment for possession of a firearm in furtherance of drug trafficking, to run consecutively, for a total of 130 months' imprisonment.

Clay appeals the denial of his motion to suppress and his conviction.

## III.    Analysis

### A.  Denial of the Motion to Suppress

In an appeal of a denial of a motion to suppress, "we review the district court's factual findings for clear error and its legal conclusions *de novo*." *United States v. Hinojosa*, 606 F.3d 875, 880 (6th Cir. 2010). "A factual finding is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been made." *United States v. Smith*, 263 F.3d 571, 581 (6th Cir. 2001). "[T]he Court considers the evidence in the light most likely to support the district court's decision." *Id.* (citation and internal quotation marks omitted).

Clay argues that: (1) since Mitchell had no authority to consent to the initial entry, the initial entry was improper and the information obtained therefrom was ill-gotten; and (2) the subsequent warrant purportedly giving the police authority to search the remainder of the apartment and closet was invalid because it was based on evidence obtained from the illegal initial entry. Specifically, Clay maintains that the police were unable to determine whether

Mitchell had authority to consent to the initial search. He argues that, since Mitchell's authority was not clear, the police had a duty to clarify the apparent ambiguities but failed to do so. Clay avers that because the initial search was therefore illegal, any information obtained as a result of the search must be removed from the affidavit in support of the search warrant. He contends the resulting affidavit lacked probable cause. Clay seems to alternatively argue that even if the information was not omitted, the supporting affidavit still lacks the requisite showing of probable cause. As a result of either alternative, Clay maintains that the evidence obtained from the second search should have been suppressed. Clay asks us to reverse the district court's decision, order the information and evidence gained from both searches suppressed, and remand the case.

The Government maintains that the police reasonably relied upon Mitchell's apparent authority for their first entry into the apartment and that her apparent authority was clear. The Government also argues that the subsequent search was authorized by a warrant based on sufficient probable cause, not on unlawfully obtained information.

We therefore have two issues before us: (1) whether the first warrantless search was legal based on consent from an individual with apparent authority, and (2) whether the subsequently obtained search warrant was supported by probable cause such that the second search was also legal.

### 1. Apparent Authority and the Initial Search

The Fourth Amendment to the United States Constitution guarantees protection against unreasonable searches and prohibits a warrantless search of a person's home. U.S. Const. amend. IV; U.S. Const. amend. XIV (as applied to state officers). There are exceptions to the warrant requirement, one of which is consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222

7

(1973). "Valid consent may be given not only by the defendant but also by a third party . . . ." *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006) (citation and internal quotation marks omitted). A warrantless entry and search does not violate the Fourth Amendment's prohibition so long as the third party consent is from one who possesses common authority over, or other sufficient relationship to, the searched area. *United States v. Matlock*, 415 U.S. 164, 170–71 (1974); *see also Illinois v. Rodriguez*, 497 U.S. 177, 179, 181 (1990). Common authority is the "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 171 n.7.

Authority to consent can be actual or apparent.[1] At issue here is apparent authority. "Apparent authority is judged by an objective standard." *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004) (citing *Rodriguez*, 497 U.S. at 188–89). The question at issue is whether "the facts available to the officer[s] at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises[.]" *Rodriguez*, 497 U.S. at 188 (citation, ellipses, and internal quotation marks omitted). If so, the search is valid. *Id.* at 189. If not, the search is unlawful unless actual authority existed. *Id.* at 188–89.

We have found that a defendant's live-in girlfriend had apparent authority to consent to a search of shared premises regardless of the fact that the couple lived together only part time,

---

[1] The Government does not assert on appeal that Mitchell had actual authority, and, in fact, the district court found that she did not. *See* R. 31 at 9–11; R. 36 at 13. Moreover, we need not decide whether Mitchell had actual authority to consent to the search because we find that the district court did not err in its determination that she had apparent authority to do so. *See United States v. Penney*, 576 F.3d 297, 307 (6th Cir. 2009).

*Penney*, 576 F.3d at 301, 307, that the couple lived together in a hotel room, *United States v. Purcell*, 526 F.3d 953, 956, 963–65 (6th Cir. 2008) (finding that the girlfriend had apparent authority only to allow the police to enter the room and search the common area and bags they reasonably thought were shared), or that the relationship was tumultuous, *Gillis*, 358 F.3d at 388. Factors we consider in determining whether a girlfriend had apparent authority include whether she had a key, *see United States v. Hudson*, 405 F.3d 425, 442–43 (6th Cir. 2005), whether she provided a detailed description of the premises and the location of drugs, *Gillis*, 358 F.3d at 391, whether her name was on the lease, s*ee id.*, and whether the police independently knew that she lived with the defendant. *Penney*, 576 F.3d at 307–08; *see also Gillis*, 358 F.3d at 387–88, 391 (finding apparent authority even when the consenting girlfriend had two residences and the defendant changed the locks on the exterior doors of the searched house); *Penney*, 576 F.3d at 309 (finding apparent authority even though the defendant had expressly asked the police to bar the consenting girlfriend from the searched house).

In this case, the district court found that it was reasonable to believe that Mitchell had apparent authority to consent to the initial search based on the fact that Mitchell told the officers that she lived with Clay for several months, that her appearance corroborated her story that Clay assaulted her that very morning, that she provided information as to the location of Clay's drugs and gun, and that she was willing to sign a consent form on which she declared the residence her premises. R. 36 at 7, 12–13.

Clay claims that this information was insufficient to show her connection to the apartment. Appellant Br. at 13. We disagree.

The information available to the officers prior to the initial search of the apartment demonstrates that Mitchell had apparent authority to consent to a search of the apartment. First, Mitchell told the officers that she lived with Clay and stored her belongings there, that she had spent the previous night at the apartment (a fact substantiated by the fact that she phoned the police before 7:00 a.m.), that she had recently been victimized (a fact corroborated by the scratches on her face), and that she shared a van with Clay (a fact corroborated when a van matching Mitchell's description was observed outside the apartment). She also provided a detailed description of the apartment, including the specific location of where Clay stored his gun and drugs.

Given these facts, we find the officers held a reasonable belief that Mitchell had authority to consent to the initial search of the apartment. Despite being forced out of the apartment, the information available to the officers corroborated Mitchell's assertion that she lived there. Clay allowed Mitchell to live with him, albeit intermittently, and in doing so, he assumed the risk that Mitchell could permit unwanted visitors. The officers were "entitled to rely on this 'assumption of risk,' and there [was] no burden on the police to eliminate the possibility of atypical shared occupancy arrangements absent some 'reason to doubt that the regular scheme [was] in place.'" *Pratt v. United States*, 214 F. App'x 532, 535 (6th Cir. 2007) (quoting *Georgia v. Randolph*, 547 U.S. 103, 111–12 (2006)). Mitchell provided no such reason.

Clay's arguments in favor of a contrary result are unavailing. First, Clay's argument that *Gillis* and *Penney* warrant a contrary conclusion fails because, like the consenting persons in those cases, Mitchell provided the officers with corroborating information that established her connection with the apartment, namely, a detailed description of its premises. *See Gillis*,

10

358 F.3d at 388, 391 (finding the defendant's girlfriend had apparent authority in part because she was able to provide a detailed description of the searched house), *Penney*, 576 F.3d at 309–10 (determining the defendant's girlfriend had apparent authority to consent to the search of unlocked, unopened containers based on her knowledge of where the drugs were located).

Second, Clay's argument that the fact that Lieutenant Sutton knew that Mitchell did not have a key to access the apartment and the fact that neither Clay's nor Mitchell's names were on the lease called into question Mitchell's apparent authority to consent, carries little weight. Appellant Br. at 12 (citing *United States v. Waller*, 426 F.3d 838, 845 (6th Cir. 2005)). In *Waller*, the Court ruled that, "if the circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent, then warrantless entry is unlawful without further inquiry." 426 F.3d at 846 (citation and internal quotation marks omitted) (finding a third-party host could not consent to the search of defendant's overnight bag when the police knew it was defendant's bag and defendant was nearby to clarify ownership).

First, as an initial matter, Clay misrepresents what Lieutenant Sutton *knew*: he did not know that Mitchell had never possessed a key, R. 25 at 158, and it is unclear whether Lieutenant Sutton knew that Gross was the lessee of the apartment prior to the first search. [2]

Second, the fact that Mitchell did not have a key is not conclusive. In this case, Lieutenant Sutton testified that he believed that Mitchell's priority upon leaving the apartment,

---

[2] While neither party appears to contest the facts established by the district court, Clay argues here that Peach Rentals informed Sutton prior to the initial search of the apartment that Gross was the true lessee of the apartment. Sergeant Quire and Lieutenant Sutton testified that they did not know that Clay was not the true lessee, R. 25 at 103, 158, and Peach Rentals' representative's testimony was unclear: she stated she informed someone in the morning but could not confirm speaking to the police about the fact until the afternoon. *Id.* at 233–34.

as a recent victim of domestic violence, was just that—her exit—not whether she had her key. R. 25 at 166.

Third, while it is unclear when the officers learned Gross was the lessee of the apartment, it is not the property interests that courts consider, rather, it is the "*mutual use*" by a person with "common authority." *Waller*, 426 F.3d at 845 (citing *Matlock*, 415 U.S. at 171 n.7) (emphasis in original). Thus, although they shared an "atypical [living] arrangement," Lieutenant Sutton had no reason to doubt that Mitchell had access to the apartment equal to Clay. *Randolph*, 547 U.S. at 112.

Accordingly, the rule established in *Waller* does not apply to this case. *See id.* (discussing *Rodriguez*, 467 U.S. 177 (1990) ("[I]t would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent. . . .")); *see also Penney*, 576 F.3d at 309 ("Lovers' quarrels and reconciliations are as much of a 'reality in today's world' as is cohabitation without 'legal formalities,' and the police cannot be faulted for not presuming that a particular quarrel put an end to the couple's relationship and living arrangements."). Although the police could have inquired into whether Mitchell had ever had a key and whether her name was on the lease, it was apparent she had authority to consent to the first search: her status suggested she had mutual use of the property and had common authority to come and go as she pleased regardless of whether her name was on the lease.

In sum, given the totality of what the officers knew prior to the consented search of the apartment, the officers reasonably relied on Mitchell's apparent authority to conduct the initial search of the apartment.

## 2. Search Warrant and the Second Search

Clay argues the second search was illegal because the warrant was invalid.

"[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "A finding of probable cause is a legal conclusion that the Court reviews *de novo.*" *United States v. Neal*, 577 F. App'x 434, 439 (6th Cir. 2014) (citing *United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008)). To demonstrate probable cause, the application for a warrant must include an affidavit that "indicate[s] a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009) (quoting *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005)). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citing *United States v. One 1984 Cadillac*, 888 F.2d 1133, 1135 (6th Cir. 1989)). We consider whether probable cause exists in light of the totality of the circumstances. *Dyer*, 580 F.3d at 390.

In addition,

> [W]hen the majority of the information in the affidavit comes from confidential sources, . . . courts must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances. While independent corroboration of the confidential informant's story is not a *sine qua non* to a finding of probable cause, in the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration.

*Id.* at 390–91 (internal citations and quotations omitted). Even a known informant's information may require corroboration if an affidavit supplies little information concerning that informant's reliability. *United States v. Woosley*, 361 F.3d 924, 927 (6th Cir. 2004).

The warrant application in the present case was prepared primarily by investigating officer Sergeant Quire. After describing the premises and the van described by Mitchell, Sergeant Quire listed evidence to be seized, including drugs. In his account, Sergeant Quire included the following information:

> Officers of the Frankfort Police Department investigated a domestic violence complaint at [the apartment's address]. The investigation led to the complainant of the domestic violence complaint advising that CLAY, Dono Demil was involved in trafficking in controlled substances from the subject premises. The complainant, who lives in the apartment with Dono Demil Clay and has done so since February, 2013, gave consent to search the premises, and officers entered the premises and observed a locked closet in the rear bedroom. There was no key available for this locked closet. The complainant also advised that Clay usually keeps a firearm in the closet and cocaine in the top dresser. The security of the premises has been maintained until the same can be searched pursuant to a search warrant. It is reasonably believed based on the foregoing that search of the subject premises will result in the collection of evidence of drug trafficking.

Affidavit, R. 23-2 (emphasis added). Sergeant Quire also reported Clay's criminal history.

As stated above, Clay argues that because the first search was illegal the underlined text of the quoted Affidavit must be excluded from consideration. However, because the initial search was valid, the fruits of that search are also valid; therefore, the information gained therefrom remains in the Affidavit. Accordingly, our review starts with whether the Affidavit, as

written, contained sufficient information to permit the issuing judge to make an independent determination of probable cause.

Clay argues that "[t]he information presented to the state court judge was only a generalized representation by an unnamed person whose veracity the police had no cause or capacity to affirm or corroborate." Appellant Br. at 15. Clay claims that Mitchell was a "completely unidentified" informant and that there was no indication of her reliability, but concedes that the underlined provisions "provided some corroboration to that [information] provided by [Mitchell] and buttressed her credibility." *Id.* at 16–17.

Clay's position that Mitchell was "completely unidentified" is misplaced. An affidavit need not name a confidential informant but need only provide indicia of the informant's reliability to raise that person's status above that of an anonymous, unidentified source. *See Dyer*, 580 F.3d at 392 ("Because the informant witnessed the illegal activity on the premises searched and was known to the officer writing the affidavit, there were sufficient indicia of reliability without substantial independent police corroboration."). In this case, while Mitchell is not named in the Affidavit, the Affidavit contains indicia of her reliability, such that she rises above an anonymous, unidentified source. *See Illinois v. Gates*, 462 U.S. 213, 233–34 (1983) ("[I]f an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary."). It is commonsensical to assume that when a person files a domestic violence complaint and provides the officers with her address that the officers at the very least know that person's identity. The Affidavit states that the informant filed a domestic violence complaint and gave the police what purported to be her address, i.e. the address of the

apartment. R. 23-2 ("[t]he Complainant, who lives in the apartment . . ."); *see United States v. Johnson*, 351 F.3d 254, 258 (6th Cir. 2003) ("Courts should review the sufficiency of the affidavit in a commonsense, rather than hypertechnical manner." (citations and internal quotation marks omitted)). Thus, it is apparent that Mitchell was not an anonymous source. Beyond this, the Affidavit contains information that corroborates Mitchell's testimony. While an address does not alone suggest criminal activity, *see United States v. Hammond*, 351 F.3d 765, 773 (6th Cir. 2003), more was provided here. The Affidavit contains information that relayed to the reviewing Special Circuit Court Judge that the officers not only confirmed the address where Mitchell said Clay lived and purportedly sold drugs, but also that a locked closet was located within the apartment. The Affidavit also links the place to be searched (the closet and dresser) with contraband (the gun and cocaine) and the person who provided that information (Mitchell).

Beyond this, Sergeant Quire included in the Affidavit that Clay had previously been charged with trafficking a controlled substance. "'[T]he application of this test [for probable cause] is not fettered by the presumption of innocence embodied in the test for conviction. Instead, a 'person of reasonable caution' would take into account predilections revealed by past crimes or convictions as part of the inquiry into probable cause.'" *Dyer*, 580 F.3d at 392 (quoting *United States v. Wagers*, 452 F.3d 534, 541 (6th Cir. 2006)). So while "a defendant's criminal history is not dispositive, it is relevant to the probable cause inquiry." *Id.* (internal citation omitted). In this case, the basis for the Affidavit was to search the apartment for the collection of evidence of drug trafficking, which is the exact charge listed in the Affidavit.

In sum, given the above consideration of the totality of the circumstances, we find that Clay did not demonstrate that the Affidavit was so lacking that there was no probable cause to support the warrant.[3]

For the above reasons, we affirm the district court's denial of Clay's motion to suppress. Given this finding, we need not address whether the good faith exception would apply. *See id.* at 393.

### B. Jury Conviction

Clay also appeals his conviction of possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1), which states in relevant part:

> (A) . . . [A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—
>
> (i) be sentenced to a term of imprisonment of not less than 5 years[.]

18 U.S.C. § 924(c)(1)(A). At the close of the Government's case, Clay moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, arguing that *United States v. Leary*, 422 F. App'x 502 (6th Cir. 2011) and *United States v. Mackey*, 265 F.3d 457 (6th Cir. 2001) commanded a finding that the facts presented at trial were insufficient to sustain a § 924(c) violation. R. 86 at 90–93. The district court denied the motion. *Id.* at 103.

We review Clay's claim under the standard established in *Jackson v. Virginia*, 443 U.S. 307 (1979), and will uphold the jury verdict if, "viewing the evidence in the light most favorable

---

[3] However, as the district court noted, this Affidavit was no model of excellence, and while we believe this is the correct decision, it was a close call.

to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* "'Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.'" *Leary*, 422 F. App'x at 506 (quoting *United States v. Fortson*, 194 F.3d 730, 735 (6th Cir. 1999)); *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984) (holding, "our court on appeal will reverse a judgment for insufficiency of evidence only if this judgment is not supported by substantial and competent evidence upon the record as a whole, and . . . this rule applies whether the evidence is direct or wholly circumstantial.").

"In *Mackey*, we interpreted the 'in furtherance of' language as requiring a higher standard of participation than the 'during and in relation to' language, holding that the government must show that the 'firearm was possessed to advance or promote the commission of the underlying [drug trafficking] offense.'" *United States v. Combs*, 369 F.3d 925, 933 (6th Cir. 2004) (internal citation omitted). By requiring the Government to provide specific facts that tie the defendant to the firearm, "Congress intended a specific nexus between the gun and the crime charged." *Mackey*, 265 F.3d at 462. "[T]he firearm must be strategically located so that it is quickly and easily available for use." *Id.* Additional factors to consider are "whether the gun was loaded, the type of weapon, the legality of its possession, the type of drug activity conducted, and the time and circumstances under which the firearm was found." *Id.*; *see also United States v. Brown*, 732 F.3d 569, 576 (6th Cir. 2013) ("We consider this non-exclusive list of six factors to help

distinguish possession in furtherance of a crime from 'innocent possession of a wall-mounted antique or an unloaded hunting rifle locked in a cupboard.'" (quoting *Mackey*, 265 F.3d at 462)).

We thus consider each of the *Mackey* factors in turn and decide whether any rational trier of fact could find that Clay placed the firearm in the closet to advance or promote his drug dealing activity. *See Mackey*, 265 F.3d at 460–61.

The first consideration is whether the Government showed that the firearm was "strategically located so that it is quickly and easily available for use." *Id.* at 462. Mitchell testified that Clay brought the firearm into the apartment when the couple moved in and that he has always stored it on the top shelf of the closet in a leather bag. She further testified that Clay only conducted drug sales from the cocaine stored in the closet and that Clay left the closet "[u]nlocked most [of] the time[]" when Clay and she were in the apartment. R. 85 at 123. The firearm was situated *next to* the cocaine and was strategically located on the same shelf so it was quickly and easily accessible. *See United States v. Ham*, 628 F.3d 801, 804, 809 (6th Cir. 2011) (finding that since the loaded gun was on top of an armoire situated just outside the closet where the drugs were found, it was strategically located so that it was quickly and easily available for use); *United States v. Swafford*, 385 F.3d 1026, 1027–29 (6th Cir. 2004) (finding a nexus between the contraband and a loaded pistol within arm's reach of the defendant when he was arrested in the house even though the drugs for sale were located in makeshift garage behind the house); *see also Brown*, 732 F.3d at 576–77 ("[T]he gun's location under the mattress in the bedroom constituted a strategic location: despite the bedroom's second-floor location, . . . the house was small enough so that someone on the first floor could retrieve the gun within ten to fifteen seconds."). The drugs and firearm were not only located on the same shelf but were also

in a closet in Clay's bedroom, next to where he slept, providing quick and easy access. *See United States v. Lopez-Beltran*, No. 12-4080, slip op. at 7 (6th Cir. Nov. 6, 2013). The first factor weighs in favor of Clay's conviction.

Other considerations are whether the firearm was loaded, its type, and whether it was possessed legally. *Mackey*, 265 F.3d at 462. In this case, it is undisputed that the firearm was loaded and a Jennings Model Bryco .380 semi-automatic handgun. R. 85 at 43. Given that Clay was a convicted felon at the time of possession, a fact stipulated to at trial, it was illegal for him to possess the handgun. *See* 18 U.S.C. § 922(g)(1). All three of these factors support Clay's conviction because the firearm was a loaded, semi-automatic handgun and illegally possessed.

We next consider the type of drug activity involved. The jury heard testimony regarding a considerable amount of cocaine recovered in Clay's apartment with a street value of roughly $10,000. R. 86 at 76. Clay stored eighty percent of the cocaine recovered from the apartment on the top shelf of the closet. Just outside the closet, in the bedroom, the police recovered significant evidence indicative of drug dealing: scales, baggies and rubber bands; numerous cell phones; and small denominations of cash. R. 86 at 78–82. This factor also weighs in favor of affirming Clay's conviction.

The final *Mackey* consideration is the time and circumstances under which the firearm was found. *Mackey*, 265 F.3d at 462. Here, the jury heard testimony that law enforcement found the gun during the same search in which they found the cocaine, a consideration that also weighs in favor of conviction. *See Brown*, 732 F.3d at 577.

Clay argues that there was no evidence that the gun was ever taken out of the leather bag or that he ever used it. The inquiry is not whether it was used, however; it is whether Clay

possessed it to advance or promote the underlying criminal act of drug trafficking. *See Mackey*, 265 F.3d at 461–62. The gun was located next to a significant amount of cocaine and it was stored in a room where other items typical of dealing drugs were also stored. *Cf. Leary*, 422 F. App'x at 513 (overturning the defendant's conviction because there was "no evidence that the sale or manufacture of drugs occurred within [the] apartment."). Over 80 grams of cocaine were found in the closet, *cf. id.* at 505 (noting the police only found 3.48 grams of crack cocaine), and, perhaps most importantly, Mitchell testified that drug sales occurred in the apartment. R. 85 at 128–29.

Clay also argues that there was a zipper on the leather bag, but that does not affect the analysis. *See United States v. Case*, 654 F. Supp. 2d 747, 752, 754 (E.D. Tenn. 2009) (finding that the discovered firearm was possessed in furtherance of drug dealing even though it was "wrapped in a cloth like material and tied at the top and bottom" because it was found within a few feet of illegal drugs), *aff'd*, 503 F. App'x 463, 466–67 (6th Cir. 2012).

Therefore, upon full consideration of whether the firearm advanced, promoted, or facilitated the crime, we believe that the evidence is sufficient to permit any rational trier of fact to find beyond a reasonable doubt that it did. Thus, we affirm Clay's conviction on the 18 U.S.C. § 924(c)(1)(A) count.

## C. CONCLUSION

For the reasons stated above, we **AFFIRM** Clay's convictions.